UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  __9/23/2021___

UNITED STATES OF AMERICA,

    -against-

ANTHONY MOLINA,

                    Defendant.

19-CR-449-3 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

    Anthony Molina ("Molina" or the "Defendant") and co-conspirators Anthony Lauria and Brian Rodriguez (collectively, the "Defendants"), were charged by superseding indictment with participating in a conspiracy to commit Hobbs Act robbery, and substantive Hobbs Act robbery, and brandishing a firearm in connection with the robberies of Verizon Stores in New Milford, Connecticut on August 10, 2017 (the "New Milford Robbery") and Mahopac, New York on February 15, 2019 (the "Mahopac Robbery"). (ECF No. 102.) Molina went to trial on June 15, 2021. On June 23, 2021, the jury returned a unanimous verdict finding him guilty of all six counts in the Superseding Indictment, and further finding that a firearm was brandished during both robberies. (Trial Transcript ("Tr.") 579-583.)

    Before the Court is Defendant's post-trial motion for an acquittal pursuant to Federal Rule of Criminal Procedure 29, or in the alternative, a new trial pursuant to Federal Rule of Criminal Procedure 33 on the basis of insufficient evidence. (ECF No. 158.) For the following reasons, Defendant's motion is DENIED.

## BACKGROUND

### I.    The Superseding Indictment

    Defendants were charged in a six-count indictment, which was filed on December 8, 2020.

(ECF No. 102.) Count One charges the Defendants with conspiracy to commit Hobbs Act robbery at a business in New Milford, Connecticut, in violation of 18 U.S.C. § 1951. Count Two charges the Defendants with committing Hobbs Act robbery on or about August 10, 2017 and aiding and abetting the same at a business in New Milford, Connecticut in violation of 18 U.S.C. §§ 1951 and 2. Count Three charges that on or about August 10, 2017, during and in relation to the crime of violence charged in Count Two, Defendants knowingly used and carried a firearm and, in furtherance of such crime, did possess a firearm, and did aid and abet the use, carrying, and possession of a firearm which was brandished during the robbery of a business in New Milford, Connecticut in violation of 18 U.S.C. §924(c)(1)(A)(ii) and (2). Count Four charges that on or about February 15, 2019, the Defendants conspired to commit Hobbs Act robbery at a business in Mahopac, New York, in violation of 18 U.S.C. § 1951. Count Five charges the Defendants with committing Hobbs Act robbery on or about February 15, 2019 and aiding and abetting the same at a business in Mahopac, New York in violation of 18 U.S.C. §§ 1951 and 2. Count Six charges that on or about February 15, 2019, during and in relation to the crime of violence charged in Count Five, Defendants knowingly used and carried a firearm and, in furtherance of such crime, did possess a firearm, and did aid and abet the use, carrying, and possession of a firearm which was brandished during the robbery of a business in Mahopac, New York, in violation of 18 U.S.C. §924(c)(1)(A)(ii) and (2).

## II.   Trial of Anthony Molina

The trial of Anthony Molina began on June 15, 2021.

### A.   The Government's Case

#### 1.   The Mahopac Robbery

Christopher Sielawa, an employee of the Verizon Store in Mahopac (the "Mahopac Store") testified that while he was preparing to close the store around 7:40 or 7:45 P.M. on February 15,

2019, a man carrying a "hand pistol" came through the main door and pointed a gun in his face. (Tr. 34-35.) The Government showed surveillance footage from the incident, which Mr. Sielawa narrated. (Tr. 36-46; Government Exhibit ("GX")-104-A to GX-104-I.) The surveillance videos show one robber with the gun in a brown jacket with a black hood over his head and a mask on his face ("the first robber") and another robber wearing a black hooded sweatshirt, a beanie hat, and sunglasses ("the second robber"). (GX 104B, GX 104C, GX 104D.)

Mr. Sielawa narrated that the first robber pointed a gun in Mr. Sielawa's face while he ordered him to the ground, and while Mr. Sielawa was face down on the floor, the first robber bound Mr. Sielawa's hands with zip ties. (Tr. 35, 38-39; GX 104-B.) Mr. Sielawa felt the first robber's bare skin he put the zip tie on Mr. Sielawa's wrists. (Tr. 39.) Mr. Sielawa was taken by the robbers to the back room where he provided them with pin codes to the merchandise safes—including a safe containing premium Apple products—because he "feared for [his] life." (Tr. 39-41.) Mr. Sielawa heard the robbers speaking Spanish and heard one refer to the other as "Brian." (Tr. 43.) When Mr. Sielawa looked at the first robber, the first robber threated to pistol whip him. (Tr. 44.) After the robbers took the merchandise, they ordered Mr. Sielawa to crawl into the bathroom and count to sixty as they escaped. (Tr. 45-46.) Mr. Sielawa was "terrified" and counted to one hundred and twenty before he broke free of the zip ties, left the bathroom, and called the police, his mother, and the Mahopac Store manager, and hit the panic button. (Tr. 46-47.) During cross-examination Mr. Sielawa admitted that in his initial report to law enforcement he described the robber with the gun as an "older Hispanic gentleman." (Tr. 49-50.)

Sergeant Michael Russo of the Carmel Police Department (Tr. 69) responded to the Mahopac Store after the robbery was reported (Tr. 72) and testified that he interviewed Mr. Sielawa and took his statement and collected surveillance video from the Mahopac Store and an

adjoining business, Skyline Towing. (Tr. 73-75; GX 103.) Sergeant Russo testified while watching the surveillance video from Skyline Towing that there appeared to be a black Honda, driven by a third suspect, the getaway driver, waiting outside the Mahopac Store during the robbery. (Tr. 76.) Sergeant Russo also narrated a portion of surveillance video from inside the Mahopac Store (GX 104-H) in which the robber in the brown jacket holding what appeared to be a "black pistol" in his right hand (Tr. 76), used his left hand to "push[] something into the magazine well of the gun," a gesture Sergeant Russo testified was "consistent with loading the firearm" (Tr. 77). Sergeant Russo has carried various firearms in relation to his job since 2001. (Tr. 71.) Sergeant Russo admitted on cross-examination that he could not tell from the surveillance video whether the robber's gun was real or not. (Tr. 78.) Sergeant Russo also narrated a surveillance video from within the Mahopac Store in which one of the robbers was pulling wires apparently attempting to disable the surveillance system because after the wires were pulled, some of the surveillance cameras went dark. (Tr. 77; GX 104-I.)

Investigator Robert Tichy of the Putnam County Sheriff's Office also responded to the scene of the Mahopac Robbery (Tr. 56-57) and photographed and videotaped the scene and collected evidence, including zip ties recovered from the bathroom floor and from Mr. Sielawa's right wrist. (Tr. 58-61, 65; GX 102-A, 102-B.) The Government offered photographs of the Mahopac Store taken by Investigator Tichy as well as a video walk-through Investigator Tichy recorded, which showed a cabinet at the front of the store from which it appeared that electronics were removed and an empty safe in the back room. (Tr. 61-64; GX-105-A, 105-B, 101-A to 101-L.)

Lisa Sheridan, a forensic scientist for the New York State Police, was qualified as an expert in DNA analysis (Tr. 105) and testified that she performed DNA analysis on the zip tie collected

4

from Mr. Sielawa's wrist (Tr. 114; GX 152). Ms. Sheridan testified that for each of the sixteen DNA loci for which she was able to make a comparison, the Defendant shared alleles with the mixture profile from the zip tie. (Tr. 122-127; GX 155 and GX 158.) She testified that "the probability of selecting an unrelated individual with a profile that could be included in this mixture" was "1 in 39.98 million" (Tr. 128; GX 153.) On cross-examination Ms. Sheridan explained that it is possible through a process called "secondary transfer" that a person could touch a surface, depositing DNA, and then another person could touch the surface afterwards such that the first person's DNA could end up on the second person's finger. (Tr. 139-40.) She additionally confirmed that DNA testing cannot determine when DNA appeared on an item or whether a major contributor of DNA personally handled an item. (Tr. 140-41.)

### 2. The New Milford Robbery

Marcelino Wright, an employee of Cellular Sales, a Verizon Wireless retailer in New Milford, Connecticut (the "New Milford Store"), testified that he was working on February 15, 2019, as was his colleague, Troy Consalvo. (Tr. 201.) Mr. Wright narrated surveillance video from the New Milford Store, which depicts Mr. Wright assisting a customer and the customer leaving the store. Mr. Wright testified that he watched the customer leave the store through the glass door and saw the customer turn toward the right and then immediately the left, and then Mr. Wright saw a black car in the parking lot. (Tr. 204; GX 202.) Minutes later, a man entered the store wearing a mask and gloves and waving a gun ("the first robber") and a second man followed behind wearing a baseball hat, sunglasses, and gloves (the "second robber"). (Tr. 205-06; GX 210.) The first robber went in the "IC room" where smartphones and tablets were stored with Mr. Wright and the second robber behind him. (Tr. 207; GX 210.) Surveillance video from inside the IC room shows the second robber loading iPads into a duffel bag and then binding Mr. Wright's hands with zip ties. (Tr. 208-09; GX 210.) Additional surveillance video shows the first robber binding Mr.

Constalvo's hands as Mr. Constalvo lays on the ground outside the IC room. (GX 210.) The first robber, who is still holding the gun, then enters the IC room with Mr. Consalvo. (GX 210.) Mr. Wright testified that the second robber threatened to hurt them if he "doesn't get his way." (Tr. 209; GX 210.) After the robbers loaded their bags with merchandise, they left. (Tr. 209.) Mr. Wright and Mr. Consalvo waited in the IC room for approximately three to four minutes and then called the police. (Tr. 210.) On cross-examination, Mr. Wright testified that he "glanced at the gun," had seen pellet guns in the past, admittedly "is no expert" and "ha[d] to conclude it was a real gun" but had told law enforcement that at the time he speculated that the gun was plastic and a pellet gun. (Tr. 211-12.)

William John Stevens, the regional director of the New York Metro market for Cellular Sales testified that as of August 2017, twenty stores were within his managerial purview, including the New Milford Store, and the New Milford Store sold a variety of cellular devices including Apple products manufactured in China. (Tr. 213-15.) Records for the New Milford Store from August 2017 maintained in the normal course of business reflected that many of the New Milford Store's customers were residents of the Southern District of New York, including in Dutchess and Putnam Counties (Tr. 215-17; GX 230), although he admitted on cross-examination that the "vast majority" of the New Milford Store's customers were Connecticut residents (Tr. 220.) At the time, Cellular Sales grouped the New Milford Store into its Westchester submarket, and the New Milford Store shared a sales manager, an operations manager, sales representatives, and inventory with other Cellular Sales stores in the Westchester submarket. (Tr. 218-219.) Mr. Stevens testified that the Apple iPhones and iPads stolen during the New Milford Robbery were valued at around $48,000. (Tr. 219-20.)

Detective Robert Guilbeault, of the New Milford Police Department, responded to the

scene and reviewed surveillance video of the New Milford Robbery. (Tr. 221.) Detective Guilbeault testified to his observations of the surveillance video including that when the customer Mr. Wright helped at approximately 7:23 p.m. left the store, he was "definitely looking around," and "checking to see if anybody else might be in the store." (Tr. 226-227; GX 214.) After watching the video, Detective Guilbeault thought there was "good potential" to find a fingerprint on the glass entry door of the store, because he could see exactly where the customer touched it. (Tr. 227-228 GX 204.) Detective Guilbeault testified that on the date of the New Milford robbery, he photographed the store and lifted a thumb print from the door. (Tr. 233-236; GX 250, GX 251, GX 201-A to GX 201-N).

Detective Guilbeault narrated that after the customer left, the black sedan in the parking lot repositioned. (Tr. 229; GX 208.) Then the first robber entered the store carrying a "firearm" in his right hand, which he pointed at Mr. Wright and Mr. Consalvo. (Tr. 229-230; GX 210.) After directing Mr. Consalvo to get on the floor, the robber appeared to "kneel down in front of him and rack or cock the firearm," which is "taking a round or bullet from the magazine, putting into the chamber so the gun would be ready to fire." (Tr. 230-31; GX 210.) On cross-examination, Detective Guilbeault clarified that it looked like the first robber was "pulling back on the slide of the firearm." (Tr. 245.) On re-cross he further clarified that the sound that racking a firearm would make could be like steel sliding on plastic, if, as is the case with Detective Guilbeault's service revolver, the top part of the slide is made of steel and the bottom of the firearm is polymer or plastic. (Tr. 249.) Detective Guilbeault further observed that the second robber was wearing a hat and sunglasses and latex gloves. (Tr. 230-31; GX 210, GX 212.)

The parties stipulated that Lauria provided his fingerprints to the New York State Licensing Division in connection with his application for employment as a security guard (Tr.

240-241, GX 900, GX 1007), and that the fingerprint Detective Guilbeault lifted from the New Milford Store was identified by a forensic analyst to be Anthony Lauria's right thumbprint. (Tr. 241-243; GX 1011.)

>        3.        Law Enforcement Investigations

Sergeant Thomas Marello, from the Yonkers Police Department testified that on April 27, 2019, he was conducting surveillance of Molina at a residential address in Yonkers, New York, with the aim of identifying Molina's telephone number. (Tr. 81.) Upon seeing Molina, Sergeant Marello instructed his partner, who was in a separate car, to call Molina's suspected phone number, ending in 2454 (the "Molina Phone") and when Marello's partner made the call, Sergeant Marello watched as Molina looked at his phone and then answered it. (Tr. 82, 86.) Sergeant Marello identified Molina in the courtroom as the individual he saw answer the Molina Phone on April 27, 2019. (Tr. 91-92).

The parties stipulated that between February 27, 2017, and December 30, 2019, a black Honda Accord registered to Kevin Lauria was located at an address in Yonkers, New York. (Tr. 96; GX 1005.) The parties further stipulated that on the date of Molina's arrest, he told the United States Marshal's Service that Fabiola Molina was his mother, Stephanie Molina was his sister, and they resided together in Yonkers, New York. (Tr. 98; GX 1013.)

The parties stipulated that law enforcement officers used geolocation information for a cellphone assigned a call number ending in 3972 (the "Lauria Phone") to locate Anthony Lauria on the date of his arrest, that Lauria was arrested in Yonkers, New York, and the Lauria Phone was seized at the time of Lauria's arrest. (Tr. 143; GX 1002.). Likewise, law enforcement officers used geolocation information for a cellphone assigned a call number ending in 1912 (the "Rodriguez Phone") to locate Brian Rodriguez on the date of his arrest, that Rodriguez was arrested in Yonkers, New York, and the Rodriguez Phone was seized at the time of Rodriguez's arrest. (*Id.*)

Further, law enforcement officers used geolocation information for the Molina Phone to locate Anthony Molina on the date of his arrest, and Molina was arrested in Yonkers, New York. (Tr. 144; GX 1002.) Subscriber records, historical location records, and call records for the Lauria Phone, the Rodriguez Phone, and the Molina Phone were also admitted by stipulation. (Tr. 144-150; GX 300-GX 324, GX 330-350, 360-374, GX 1003, GX 1008, GX 1009). In addition, subscriber records, call records and information provided by Verizon regarding the city and state of cell towers used by a fourth phone, assigned a call number ending in 4879 (the "2017 Molina Phone") were admitted by stipulation. (Tr. 150-152; GX 380-389, GX 1010.) The Molina Phone was subscribed in the name of ASA Cornerstone, and the 2017 Molina Phone was subscribed to in the name of "Jonathan Rivera." (Tr 342; GX 380.) The parties stipulated that Molina's mother, Fabiola Molina, is the registered agent of ASA Cornerstone. (GX 1006.)

Investigator Matthew Tunney, a Task Force Officer from the Federal Bureau of Investigation (the "FBI") Safe Streets Task Force testified about digital evidence from the Rodriguez Phone, and from Apple iClouds maintained by Anthony Lauria and Anthony Molina. (Tr. 261-262). Investigator Tunney walked through the evidence depicted in charts summarizing digital evidence—including from Apple iCloud accounts registered to Lauria, Molina, and Rodriguez—that was admitted by stipulation. (Tr. 261-262; GX 1520.)

Rodriguez stored multiple contact numbers in his phone under variations of the contact name "Molina," including the number assigned to the Molina Phone, which was stored as "Molina Nunuu," and the number assigned to the 2017 Molina Phone, which was stored as "Molina 4." (Tr. 265-266; GX 802.) In addition, the location history from the Waze navigation application on Rodriguez's phone included a search for the address of the Mahopac Store on February 13, 2019, two days before the Mahopac robbery occurred. (Tr. 277-278; GX 803.) Molina's Apple iCloud

account contained photographs of the Mahopac Store, its address, location on a map, and business hours. (Tr. 274-76; GX 534, GX 534-A, GX 535, GX 535-A; GX 536, GX 536-A.)

Molina's iCloud also contains text message exchanges between Lauria and Molina three days prior to the Mahopac Robbery about a plan for which three people was "perfect" (Tr. 276-277; GX 505-B); between Lauria and Molina the day after the Mahopac Robbery, in which Lauria sent a photograph of two handguns, and Molina responded, "You like the one on the right or the one we had today?" (Tr. 280; GX 505-B and GX 404); between Molina and a contact saved as "Moe Phones" from the day after the Mahopac Robbery, in which Molina indicated he had various cellphone models, stating, "everything Verizon" (Tr. 289-290; GX 502-A); and between Molina and a contact saved as "Steph" from the day after the Mahopac Robbery, in which Molina stated he was "in the middle of Fordham with $20,000 in [his] pocket" (Tr. 288; GX 506-A.) A video file dated February 16, 2019 depicts the Defendant holding a stack of cash to his ear as if it is a cell phone and smiling at the camera. (Tr. 279; GX 511 and GX 511-A.) In addition, the parties stipulated to the Spanish / English translation of a text message saved in Molina's Apple iCloud (GX 537), from the date of the Mahopac Robbery, with a contact with the email jhonarias2420@hotmail.com which states in part:

> Today I was able to send a phone it arrives tomorrow.
> I didn't send more because I was at work and there you have to send them early so that they arrive the next day.
> How much do you get paid for the Verizon XS64?

(Tr. 385; GX 1014.)

Molina's Apple iCloud account also included photographs and videos of firearms and ammunition, including photographs of black handguns. (Tr. 266, 268, 269, 271; GX 512, GX 522, GX 529, GX 527, GX 532.) Some of the photographs of firearms and ammunition were saved to Molina's iCloud account in November and December 2018 (GX 532-A, GX 527, GX 510-A)

February 2019 (GX 404). Some of the photographs have geolocation information indicating that the photographs were taken in the vicinity of Molina's residence in Yonkers, New York. (Tr. 272; GX 532-A.) Molina's iCloud also contained a text message sent by Molina on November 28, 2018, about purchasing a "9" and "explosive bullets." (Tr. 270-271; GX 503-C). The iCloud account also contained a video of Molina driving a car while waving a silver handgun that was recorded in December 2018 (Tr. 273; GX 510, GX 510-A.)

Molina's iCloud account also contained various versions of a note listing iPhones and their prices based on whether the devices are locked or unlocked, the carrier for the phone, and phone models and sizes modified September 26, 2018 (Tr. 267; GX 518 and GX 518-A); December 7, 2018 (Tr. 271; GX 530 and GX 530-A); and February 16, 2019 (Tr. 279; GX 538 and 538-A). The account also contained personal identifying information for "Jonathan Rivera" (Tr. 267; GX 514); and photographs of numerous packaged Apple iPhones (Tr. 268, 273; GX 516 and GX 524). Molina's iCloud contained a text message exchange between Lauria, Rodriguez, and Molina dated March 22, 2019 (Tr. 281-82; GX 507-D) linking to an article titled "New Milford Police investigating armed robbery" with a photo of Lauria (Tr. 281-283; GX 405 and GX405-A); and searches for "aggravated robbery" and "aggravated robbery in CT" (Tr. 288; GX 502-C) and images from criminaldefense.com regarding the state's burden to prove armed robbery (Tr. 287-288; GX 539, GX 539-A, GX 540, GX540-A.)

Amanda Pinero, a staff operations specialist from the FBI who conducted call record analysis (Tr. 293-294; GX 1510) testified that Anthony Lauria was the subscriber to the Lauria Phone, Brian Rodriguez was the user of the Rodriguez Phone, and that she attributed the Molina Phone to Anthony Molina, based on Sergeant Marello's testimony. (Tr. 295-296.) The Lauria Phone, the Rodriguez Phone, and the 2017 Molina Phone had numerous contacts on August 10,

2017. (Tr. 298.) Likewise, the Lauria Phone, the Rodriguez Phone, and the Molina Phone had numerous contacts on February 15, 2019. (Tr. 299.) Ms. Pinero conducted common call analysis in which she compared calls made and received by the 2017 Molina Phone to calls made and received by the Molina Phone. (Tr. 300-302.) In the weeks before and after each robbery, both the 2017 Molina Phone and the Molina Phone had numerous contacts with the Lauria Phone and the Rodriguez Phone as well as phone numbers stored in Molina's iCloud as "Steph," "Dad," and "Fabiola Molina." (Tr. 301-304.) Based on the common calls, it was "highly likely the same individual" was using both the 2017 Molina Phone and the Molina Phone. (Tr. 304.) On cross-examination, Ms. Pinero testified that she did not analyze whether any of the relevant phones made calls to other numbers between 7:03 PM and 8:16 PM on February 15, 2019, and 7:15PM and 10:31 PM on August 10, 2017. (Tr. 308-10.)

Special Agent Michael Sabric, a member of the FBI cellular analysis survey team (Tr. 323-324), was qualified as an expert in the analysis of cell site records and cell site technology (Tr. 327), and testified about the analysis he performed regarding the cell site locations of the Molina Phone, the Lauria Phone, and the Rodriguez Phone on the date of the Mahopac Robbery, and the cell site locations of the Lauria Phone and Rodriguez Phone on the date of the New Milford Robbery, as well as the originating and destination city and state of the cell sites used by the 2017 Molina Phone on the date of the New Milford Robbery (Tr. 337; GX 1530). Special Agent Sabric testified that on the date of the Mahopac Robbery, the Rodriguez Phone, the Lauria Phone, and the Molina Phone each traveled to the area of Mahopac, New York, before the time of the Mahopac Robbery, and back to the area of Yonkers, New York, after the time of the Mahopac Robbery. (Tr. 358, 361, 363.) He further testified that on the date of the New Milford Robbery, the Rodriguez Phone, the Lauria Phone, and the 2017 Molina Phone all traveled from the area of Yonkers, New

York, to the area of New Milford, Connecticut, before the time of the New Milford Robbery, and back south again, after the time of the New Milford Robbery. (Tr. 346, 349, 353.)

    *B.*      *The Defendant's Rule 29 Motion*

At the close of the Government's case, defense counsel moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a), based upon "insufficient evidence" as to counts One, Two and Three and insufficient evidence of venue as to the same counts, which pertain to the New Milford robbery. (Tr. 374-75.) The Court denied Defendant's motion. (Tr. 379.)

    *C.*      *The Defendant's Case*

Defendant called as a witness Troy Consalvo, who was working at the New Milford Store on the date of the New Milford Robbery. (Tr. 388.) While he was working at his desk "someone came into the store," "pulled guns," and "directed [him] to get down on the ground." (Tr. 389; GX 210). The man "cocked the gun," and he was "unsure at the time" but thought it "sounded plastic" but Mr. Consalvo "wasn't willing to take any chances." (Tr. 389). He "put [his] hands up and got down on the ground." (Tr. 390.) Mr. Consalvo testified that he could only see half of the first robber's face because of the mask he was wearing but he "was brown in skin tone." (Tr. 392.)

The Defendant also testified. He admitted to carrying guns after he was kidnapped and to engaging in identity theft but denied partaking in either of the robberies charged. (Tr. 429.) According to the Defendant, on August 29, 2017, he was kidnapped by individuals known to him as Gustavo and Frankie Vasquez who held him for a few hours while they pistol whipped and hit him, for which he had to go to the hospital. (Tr. 431-33.) After the kidnapping, the Defendant possessed and displayed firearms because he was "never going to let that shit happen again." (Tr. 435.) The Defendant offered two photographs from his Snapchat account, which depicted a firearm in his gym bag (Tr. 437-439; DX D and DX F), which he explained were posted to Snapchat on November 10, 2017, and it was his "first gun post ever." (Tr. 439.) Molina clarified that before he

13

was kidnapped he had never had a picture of a gun or held a gun. (Tr. 441.) On December 19, 2019, the Defendant posted a video to social media that depicted him waving a gun around inside his car, "to show that [he] was armed" and there would be "potential conflict" if the Vasquez brothers were "waiting" for him. (Tr. 435-436.)

The Defendant testified he kept photographs of Apple products and price lists for iPhones on his iCloud because he and a group of fifteen to twenty other people performed identity theft and used stolen personal information to fraudulently buy cellphones at cellphone stores. (Tr. 440-442.) The Defendant was "known by a lot of people to be quite good at identity theft." (Tr. 442.) He further testified that he would talk to a lot of the people he did identity theft with including in group chats, and they referred to "hitting stores." (Tr. 442.)

On cross-examination, the Defendant acknowledged he "had a real gun in the fall of 2017" (Tr. 445), and the firearms depicted in Defense Exhibit F, and Government Exhibits 510, 512, and 532, were all real firearms that he possessed at one time or another (Tr. 445-448). The Defendant also reviewed a text message from November 28, 2018 (GX 502-C) and identified his requests for a "9 man brunch" and "food for a .38" as being requests for a 9 millimeter firearm and .38 caliber ammunition. (Tr. 447-438.) He further testified that he sold a gun to Lauria, so both Molina and Lauria had guns. (Tr. 449.)

With respect to the Mahopac Robbery, the Defendant stated he knew his DNA was on one of the zip ties recovered from the scene. (Tr. 454.) He also confirmed that in February 2019, he used the Molina Phone (Tr. 452), which was in Mahopac on the date of the Mahopac robbery (Tr. 454). When asked about the texts with Lauria on February 12, 2019, days before the Mahopac Robbery, Molina claimed that they were talking about identity theft, which requires multiple people. (Tr. 452-53.) The Defendant acknowledged that his phone, Lauria's Phone, and

14

Rodriguez's phone were all in Mahopac on the day of the robbery at around the same time and stated that its "very troubling." (Tr. 455.) Molina claimed that he was not with Lauria and Rodriguez at the store and that's why Molina called Lauria at 7:00 PM because "why would I call somebody that I am right next to?" (Tr. 455.) Molina then testified that the text message he sent to his sister regarding having $20,000 in his pocket and the texts with "Moe Phones" shortly after the Mahopac Robbery were about phones he sold that he got from Lauria and Rodriguez. (Tr. 457.)

With respect to the New Milford Robbery, the Defendant acknowledged that he used the 2017 Molina Phone during August 2017 but insisted his friend "Omar" had the phone between 3:00 p.m. and 9:30 p.m. on the date of the New Milford Robbery. (Tr. 461-462, 464.)

The Defendant testified he saw the surveillance video of the New Milford Robbery and the Mahopac Robbery during the trial, and he was not in those videos. (Tr. 430-431.)

D.    *The Jury's Verdict*

After approximately four hours of deliberation, the jury returned a unanimous verdict finding the Defendant guilty of all six counts in the Superseding Indictment, and further finding that with respect to Counts Three and Six, a firearm was brandished. (Tr. 579-583.)

**III.    Post-Trial Motion**

On June 29, 2021, Molina filed the instant motion. (ECF No. 158.) The Court approved the parties' proposed briefing schedule. (ECF No. 166.) On August 6, 2021, Defendant filed his Memorandum in Support. ("Def. Mot." (ECF No. 167).) The Government filed its opposition on August 27, 2021. ("Gov't Opp'n" (ECF No. 169).) Defendant filed a reply on September 3, 2021. ("Def. Reply" (ECF No. 170).)

**DISCUSSION**

Defendant moves for (I) a judgment of acquittal, pursuant to Federal Rule of Criminal Procedure Rule 29, on the basis that the evidence at trial was insufficient (A) to sustain a conviction

on any count, and (B) to establish venue in the Southern District of New York with respect to

Counts One, Two, and Three (the New Milford Robbery counts); and (II) a new trial, pursuant to

Federal Rule of Criminal Procedure Rule 33, on the same bases.

## I.      Rule 29 Motion

### A.      Legal Standard

Rule 29 provides that after the close of the Government's evidence in a criminal trial, the

Court "on the defendant's motion must enter a judgment of acquittal of any offense for which the

evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).  Specifically, a court "will

grant a motion to enter a judgment of acquittal on grounds of insufficient evidence if it concludes

that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt."

*United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003).

This standard imposes a heavy burden on a defendant. Indeed, a court must affirm a

conviction if "*any* rational trier of fact could have found the essential elements of the crime beyond

a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  Put differently, a court will

grant a motion for acquittal only if "the evidence that the defendant committed the crime alleged

[was] 'nonexistent or [] meager.'" *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999)

(quoting *United States v. White*, 673 F.2d 299, 301 (10th Cir. 1982)).

When assessing the sufficiency of the evidence, the Court must "view the evidence in the

light most favorable to the government and construe all possible inferences in its favor." *United*

*States v. Badalamenti*, 794 F.2d 821, 828 (2d Cir. 1986). The Court must consider direct evidence,

as well as any circumstantial evidence proffered. *United States v. Martinez*, 54 F.3d 1040, 1043

(2d Cir. 1995). In so doing, the Court must view the evidence in its totality, not in isolation, and

the government is not required to negate every possible theory of a defendant's innocence. *United*

*States v. Rosenthal*, 9 F.3d 1016, 1024 (2d Cir.1993). Most importantly, the Court must be mindful

not to "usurp[ ] the role of the jury," *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004) (citing *Jackson*, 335 F.3d at 180), or "substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury," *id*. (citing *Guadagna*, 183 F.3d at 129) (internal quotations omitted).

### B.      Evidence of Molina's Participation in the Mahopac Conspiracy & Robbery

Defendant's motion papers purport to challenge the sufficiency of the evidence as to all six counts, including those related to the Mahopac Robbery; however, he does not actually present any argument regarding insufficient evidence of Defendant's participation in the Mahopac conspiracy or robbery.[1] In any event, viewed in totality and in the light most favorable to the Government, there is more than sufficient evidence of Defendant's role in the Mahopac robbery and conspiracy including that: Defendant's DNA was found on a zip-tie he used to bind the hands of Mr. Sielawa during the Mahopac Robbery (Tr. 128; GX 153.); and Defendant confirmed that in February 2019 he used the Molina Phone (Tr. 452), which he admits was in Mahopac on the date of the Mahopac robbery (Tr. 454). While Molina testified that he was nearby but not at the Mahopac Store during the robbery and the phones he sold after were brought to him by Lauria and Rodriguez, the Court may not usurp the role of the jury, which reasonably could have determined that Molina's alternate account was not credibly. Insofar as Defendant challenges sufficiency of the evidence as to Counts Four and Five, his motion is DENIED.

---

[1] Insofar as Defendant failed preserve any challenge regarding the Mahopac Robbery counts at the close of the Government's case when he challenged sufficiency for only Counts One, Two, and Three, which relate to the New Milford Robbery, as demonstrated above, the Government presented sufficient evidence as to Defendant's participation in the Counts related to the Mahopac Robbery.

### C.     Evidence of Molina's Participation in the New Milford Conspiracy & Robbery

Defendant contends that there is insufficient evidence regarding his participation in the New Milford conspiracy and robbery, focusing on the fact that there was no forensic evidence linking Molina himself to the New Milford robbery and that neither of the victims identified him. However, "[n]o particular type of evidence is required, so long as the evidence taken together is such that a 'rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Lee*, 660 F. App'x 8, 15 (2d Cir. 2016) (quoting *United States v. Persico*, 645 F.3d 85, 105 (2d Cir. 2011)). Further, "a jury's verdict may be based entirely on circumstantial evidence." *Martinez*, 54 F.3d at 1043.

The Government's case against Defendant as to the New Milford Robbery was based in part on certain characteristics common to both charged robberies from which the jury reasonably could have concluded that the same crew perpetrated both robberies. The robbery victims testified that shortly before closing time at their respective Verizon stores, two men came in and robbed them. (Tr. 35, 204-206.) The victims testified that the first robber wielded a gun, that they were restrained with zip ties, brought to the back room, and forced to standby while the inventory of Apple products was looted. (Tr. 38-47; 205-210.) Law enforcement witnesses testified that a black sedan driven by the getaway driver waited outside for the duration of each robbery, and that before leaving the stores the robbers attempted to disable the surveillance systems. (Tr. 76-77, 228, 233.) Surveillance video from the New Milford Store clearly depicted Lauria entering the store in advance of the robbery, then walking toward a black sedan waiting in the parking lot (GX 204, GX 214) and Lauria's fingerprint was lifted from the door of the New Milford Store. Surveillance video from each store depicted individuals of similar build entering the stores to commit the robberies. (GX 104-A, GX 104-B; GX 208). During each robbery, the first robber to enter the store wore a mask and brandished a gun, and the second robber wore a cap, sunglasses, and gloves, and carried a bag. (GX 104-A, GX 104-B, GX

18

208).

Additionally, cellphone evidence in the form of subscriber records, call records, and cell site location records show that three cell phones, the 2017 Molina Phone, the Lauria Phone, and the Rodriguez Phone were in contact on the date of the New Milford Robbery and then traveled at approximately the same time from Westchester to New Milford and then back to Westchester. (GX 300-GX 324, GX 330-GX 350, GX 380-GX 399, GX 1003 GX 1008, GX 1010, GX 1530). Molina also admitted that he used the 2017 Molina Phone in August 2017, which was corroborated by the entry in Rodriguez's contact list for the 2017 Molina Phone as "Molina 4." (GX 802). Molina's claim without any support, that "Omar" had the phone from 3:00 p.m. and 9:30 p.m. on the date of the New Milford Robbery (Tr. 461-462) does not in and of itself create reasonable doubt. The jury could have taken Molina at his word that he used the phone during the month of August 2017 and disbelieved his unsubstantiated claim that "Omar" had the phone during the hours relevant to the New Milford Robbery.

The Government also presented evidence linking Molina to the New Milford Robbery in the form of a text conversation between the Defendants in 2019 after law enforcement identified Lauria as the getaway driver for the New Milford Robbery (GX 507-F), and Molina's internet searches about aggravated robbery in Connecticut, and "armed robbery." (GX 502-C, GX 539.)

In sum, when viewed in the light most favorable to the Government and deferring to the jury's credibility assessments, the Government presented ample evidence of Molina's participation in the New Milford Robbery, especially when coupled with the overwhelming evidence of his participation in the Mahopac robbery. The Court denies Defendant's motion as to sufficiency of the evidence as to Counts One and Two.

### D.   *Evidence of Firearms Offenses*

Defendant avers that because no weapon was recovered or fired, and because no victim saw bullets, the Government has failed to produce sufficient evidence that a real firearm was used in either robbery. However, the Second Circuit has held that where "a gun is not recovered, eyewitness testimony may be sufficient for the government to meet its burden of proof under § 921(a)(3), so long as it provides a rational basis for the jury to find that the object observed by eyewitnesses 'was, in fact, a firearm.'" *United States v. Jones*, 16 F.3d 487, 490 (2d Cir. 1994); *see also United States v. Brown*, 784 F. App'x 1, 4 (2d Cir. 2019) ("The mere possibility that a firearm observed by a witness could be a sophisticated toy or other facsimile does not necessarily create a reasonable doubt, nor is the government required to disprove that theoretical possibility. Rather, it is for the jury to weigh the evidence and determine whether the government met its burden of demonstrating that [a defendant] possessed a firearm." (internal quotation marks and citations omitted)).

The Government presented evidence that gave the jury a rational basis for concluding that a firearm was used in both robberies. A law enforcement officer familiar with weapons reviewed the surveillance video and observed that during the Mahopac Robbery the first robber appeared to "rack" or "cock" the weapon, something that one would only do with a firearm (Tr. 230-31, 245.) One of the victims, Mr. Consalvo, also testified that the first robber "cocked the gun." (Tr. 389.) and though Mr. Consalvo testified that it "sounded plastic" (Tr. 389), Detective Guilbeault testified that the sound of racking a firearm could be like steel sliding on plastic, if, as is the case with Detective Guilbeault's service revolver, the top part of the slide is made of steel and the bottom of the firearm is polymer or plastic (Tr. 249). Similarly, Sergeant Russo testified that in the surveillance video of the New Milford Robbery he saw the first robber "push[] something into the magazine well of the gun," a gesture Sergeant Russo testified was "consistent with loading the firearm." (Tr. 77.) In

sum, the victim in the New Milford Robbery and the two victims in the Mahopac Robbery all testified that the first robber had a gun, which is visible on the surveillance video of both incidents. Law enforcement officers who reviewed the surveillance videos further testified that the first robber used the gun in a manner consistent with the use of a real firearm.

In addition, the Government adduced significant evidence of Defendant's use and possession of firearms between August 2017 and February 2019. This evidence includes the Defendant's own admission that following an alleged kidnapping in early August 2017 he procured various firearms and ammunition and his further testimony that weapons displayed in images and videos stored on his iCloud account were real firearms.

In sum, the Government presented ample evidence from which the jury could rationally conclude that the item visible in the first robber's hand in the surveillance video for both robberies was a firearm. The Court denies Defendant's Rule 29 motion based on insufficient evidence for the firearm offenses, Counts Three and Six.

### E.   Evidence of Venue for the New Milford Counts

Defendant avers that "there was no evidence" that any acts in furtherance of the New Milford Robbery took place in the Southern District of New York (Def.'s Mem. at 9; Def's Reply at 1 (citing *United States v. Davis*, 689 F.3d 179, 186 (2d Cir. 2012)). However, the Government adduced proof beyond a reasonable doubt that the Defendant and his co-conspirators demonstrated venue in the Southern District of New York by a preponderance of the evidence.[2]

With respect to a conspiracy, venue is proper in "any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a). "[V]enue may lie in any district in which

---

[2] "The venue requirement, despite its constitutional pedigree, is *not* an element of a crime so as to require proof beyond a reasonable doubt; rather, venue need be proved only by a preponderance of the evidence." *United States v. Rommy*, 506 F.3d 108, 119 (2d Cir. 2007) (quotations omitted).

the conspiracy was formed or in any district in which a conspirator committed an overt act in furtherance of the criminal scheme." *United States v. Rommy*, 506 F.3d 108, 119 (2d Cir. 2007) "Because the Hobbs Act criminalizes a particular type of 'robbery'—*i.e.,* one that 'obstructs, delays, or affects commerce'—venue for a substantive Hobbs Act charge is proper in any district where interstate commerce is affected or where the alleged acts took place." *United States v. Davis*, 689 F.3d 179, 186 (2d Cir. 2012) (quoting 18 U.S.C. § 1951(a); other quotation marks and citations omitted). Further, "only a *de minimis* showing is necessary to establish the interstate nexus required for Hobbs Act jurisdiction." *United States v. Silverio*, 335 F.3d 183, 186 (2d Cir. 2003). "[T]he law does not require a defendant to have actual knowledge that an overt act will occur in a particular district to support venue at that location. At most, it asks that the overt act's occurrence in the district of venue have been reasonably foreseeable to a conspirator." *Rommy*, 506 F.3d at 123. In sum, to meet the venue requirement, the Government needs to prove by a preponderance of the evidence that Molina "(1) knew or reasonably should have foreseen that interstate commerce would have been affected in the Southern District by completion of the [New Milford Robbery], or (2) took a substantial step in furtherance of that intended robbery in the Southern District." *Davis*, 689 F.3d at 188. There is sufficient evidence for either theory of venue.

As to the first theory, Marcelino Wright and John Stevens testified that in August 2017, the New Milford Store sold Apple products manufactured in China (Tr. 201, 215) and Stevens further testified that the New Milford Store served customers residing in the Southern District of New York, and pooled operational resources, including inventory and staff, with Cellular Sales stores located in the Southern District of New York (Tr. 215-218; GX 230) Thus, there was sufficient basis for the jury to conclude venue was appropriate in the Southern District of New York for the substantive Hobbs Act robbery charged in Count Two. *See e.g.*, *United States v.*

*Jianjun Liu*, 515 F. App'x at 51 (2d Cir. 2013) (finding "testimony explaining the bus company's customer base and ticket sales in the Eastern District of New York [] sufficient for the District Court to find that the conduct with which [the defendant] was charged affected interstate commerce in that district"); *United States v. Elias*, 285 F.3d 183, 189 (2d Cir. 2002) (holding that showing a robbed grocery store sold goods produced outside of New York state was sufficient to show actual effect on interstate commerce).

As to the second theory, Agent Sabric testified that based on cell site records for the Lauria Phone and the Rodriguez Phone, and billing records for the 2017 Molina Phone indicating the originating city and state of cell sites used by the 2017 Molina Phone, that on the date of the New Milford Robbery, the 2017 Molina Phone, the Lauria Phone, and the Rodriguez Phone all traveled from the Southern District of New York, to New Milford, Connecticut, hours before the robbery, and back to the Southern District of New York, specifically, to Yonkers, New York, hours after the robbery. (Tr. 346, 349, 353; GX 1530.) In addition, the parties stipulated that Molina resided in Yonkers, New York, and that his co-conspirators were arrested in Yonkers, New York. (GX 1002, GX 1013.) Other pieces of evidence, including records from T-Mobile, Sprint, AT&T, Apple, and the New York State Department of Motor Vehicles also tied the defendant and his co-conspirators to Yonkers, New York. (GX 301, GX 330, GX 360, GX 401, GX 501, GX 1005.) Even if the New Milford Robbery "did not take place in this district," it would be rational for the jury to infer that the planning occurred in the Southern District and that the stolen merchandise was immediately brought back to the Southern District, where all three Defendants reside. *See, e.g., Davis*, 689 F.3d at 189 (holding that a defendant who attempted to affect illicit commerce by robbing a drug dealer known to procure drugs out of state and sell them in the Bronx and Manhattan while the drug dealer was in the Eastern District of New York, " reasonably could have foreseen"

the impact of his conduct on the Southern District, which supported a finding of venue in both districts); *Ramirez v. United States*, 898 F. Supp. 2d 659, 667 (S.D.N.Y. 2012) (holding that interstate commerce in the Southern District was affected because the robbery occurred in New Jersey but the robbers divided and sold the stolen cocaine in the Bronx after transporting it over state lines).

As Defendant concedes (Def. Mot. at 9), because venue is proper as to the Hobbs Act robbery charged in Count Two, venue is also proper as to the accompanying firearms offense charged in Count Three. *See United States v. Rodriguez–Moreno*, 526 U.S. 275, 282 (1999) ("Where venue is appropriate for the underlying crime of violence, so too it is for the § 924(c)(1) offense.").

Accordingly, Defendant's Rule 29 motion is DENIED as to insufficient evidence of venue for the New Milford Robbery charges.

## II.    Rule 33

In the alternative to his Rule 29 motion for acquittal, the Defendant seeks a new trial under Rule 33, also on the basis of insufficient evidence.

### A.    Legal Standard

Under Rule 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. Courts grant Rule 33 motions "only in extraordinary circumstances." *United States v. Moore*, 54 F.3d 92, 99 (2d Cir. 1995). While Rule 33 "confers broad discretion upon a trial court," the Court may only grant such a motion to avoid "perceived miscarriage of justice." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992). The Court must "examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). The Court must also "defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses."

*United States v. LeRoy*, 687 F.2d 610, 616 (2d Cir. 1982). The "ultimate test" for the Court's consideration is "whether letting a guilty verdict stand would be a manifest injustice" such that "an innocent person may have been convicted." *Ferguson*, 246 F.3d at 134 (citation and quotation marks omitted); *see also United States v. Sanchez,* 969 F.2d 1409, 1414 (2d Cir. 1992) ("Although a trial court has broader discretion to grant a new trial pursuant to Rule 33 than to grant a motion for a judgment of acquittal pursuant to Fed. R. Crim. P. 29, where the truth of the prosecution's evidence must be assumed, that discretion should be exercised sparingly.") "The defendant bears the burden of proving that [he or she] is entitled to a new trial." *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009).

      B.    *Application*

      As already explained, the Government adduced more than sufficient evidence to support the jury's verdict of conviction of all six counts. Having reviewed the evidence as a whole, taking into account all facts and circumstances, the Court is "satisfied that competent, satisfactory and sufficient evidence in the record supports the jury verdict." *Ferguson,* 246 F.3d at 134 (internal quotation marks and citation omitted). Defendant has plainly failed to meet his burden to demonstrate either "exceptional circumstances" or that injustice will result if the jury's verdict stands. *See, e.g.*, *United States v. Aponte-Vega*, 230 F.3d 522, 525 (2d Cir. 2000) (per curiam) (explaining that a new trial is generally "merited only if . . . the evidence is such that it would probably lead to an acquittal" (internal quotations omitted)); *United States v. Noble*, No. 07 CRIM. 284 (RJS), 2008 WL 140966, at *6 (S.D.N.Y. Jan. 11, 2008) (denying Rule 33 motion where defense had "simply reiterate[d] the arguments asserted in its [unsuccessful] Rule 29 motion, namely that the Government introduced insufficient evidence"). Accordingly, the Court DENIES Defendant's motion under Rule 33.

**CONCLUSION**

For the foregoing reasons, Defendant's motion pursuant to Rule 29 to acquit, or in the alternative, order a new trial under Rule 33, is DENIED.

The Clerk of the Court is respectfully directed to terminate the motion at ECF No. 158. Sentencing is scheduled to take place in person on September 24, 2021 at 11:15 AM.

Dated:   September 23, 2021                                 SO ORDERED:
         White Plains, New York

                                              _____
                                                   NELSON S. ROMÁN
                                                 United States District Judge